PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
JORGE FRAU, Defendant and Appellant.

No. 6700.   Argued February 15, 1938.—Decided February 25, 1938.

*C. Iriarte, F. Fernández Cuyar* and *Héctor González Blanes* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE TRAVIESO delivered the opinion of the Court.

On June 20, 1936, the prosecuting attorney for San Juan filed an information against Jorge Frau for violation of the provisions of Act No. 24, approved April 20, 1928 (p. 166), consisting in his having "unlawfully, wilfully, and maliciously sold, offered, and had for sale, and stored, coffee adulterated with grain, for the purpose of using it for human consumption."

On January 13, 1937, the defendant moved for dismissal of the proceeding, upon the ground that, the complaint having been filed on June 20, 1936, the trial should have been held on or before October 18, 1936, in accordance with the provisions of subdivision 2 of Section 448 of the Code of Criminal Procedure.  The motion was overruled, and a trial had on January 19, 1937, and the defendant convicted and sentenced to a fine of $25.  On September 23, 1936, the date originally set for the trial, the prosecuting attorney, with leave of court and over the objection of the defendant, amended the complaint, substituting for the phrase "coffee

adulterated with grain," the phrase "coffee adulterated with its own hulls."

Defendant assigns three errors. In the third assignment it is contended that defendant's guilt has not been established beyond a reasonable doubt, since the evidence is clearly insufficient.

The basic evidence for the People consisted in the testimony of Dr. Rafael del Valle Sárraga, chemist and bacteriologist in the insular Department of Health. In substance he testified: that he made an analysis of the sample of coffee taken in the defendant's establishment; and that it appeared to have been adulterated with a small quantity of coffee hulls. On cross-examination he answered that he had used the phrase "slight adulteration," because the adulteration had been something like 1 per cent hull in all of the coffee; that coffee normally contains some raw fibre after it is removed from the hulll; that 12 per cent of raw fibre is considered standard in a normal coffee; that this average may be more or less, depending on the multitude of factors affecting the amount of raw fibre. Upon being asked by defendant whether in this case the percentage shown by the analysis indicated an active adulteration, the witness answered:

"In this case the data is on the border line between what constitutes an accidental contamination and an intentional addition. Rather it is within the zone of intentional adulteration, *but this witness does not mean to say that such has been the case.* What I mean to say is that if there has been a contamination there undoubtedly has been considerable negligence or carelessness or perhaps some very serious defect in the procedure itself to cause the appearance of fibre in quantity. . ." (Italics ours.)

Later on, on being questioned as to whether as a result of the analysis he could say that there had been in this case an active or intentional adulteration, he answered that he could not so state with certainty.

Mr. Angel M. Pesquera, an expert chemist, testified for the defendant to the effect that he made an examination of

the coffee and found 12.90 per cent of raw fibre; that this figure does not in itself indicate active adulteration, since it is a normal figure and rather lower than normal in some cases; that there is no legal standard with respect to the quantity of raw fibre which roasted and ground coffee may contain; that the federal department in Washington considers 12.90 per cent as normal; that coffee should be considered to have been adulterated with hulls when containing more than 15 per cent of raw fibre.

No evidence whatever appears from the record tending to show that the defendant intentionally adulterated the coffee.

The expert testimony is in our judgment insufficient to justify a conviction. How is it possible for a trial judge to be convinced beyond a reasonable doubt of the guilt of the defendant, when the prosecution's expert himself admits that it is a borderline case, on the dividing line, and does not dare state with certainty that there has been an intentional adulteration?

The insufficiency of the evidence is in our opinion so patent that we consider it our duty to reverse the judgment appealed from.

Mr. Justice Córdova Dávila took no part in the decision of this case.